IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs May 22, 2007

## HUGH WILLIAMS v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Greene County**
**No. 06-CR-073    James E. Beckner, Judge**

_____

**No. E2006-01194-CCA-R3-PC - Filed July 5, 2007**

_____

In 2005, the petitioner pled guilty to second degree murder and conspiracy to commit first degree murder and received an effective sentence of fifty years. Subsequently, he filed a timely *pro se* petition for post-conviction relief, alleging that his plea of guilty to the latter offense was unknowing and involuntary and that counsel who had represented him at the time of the plea was ineffective. Following an evidentiary hearing, the post-conviction court dismissed the petition and this appeal followed. We affirm the dismissal.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR. and JOHN EVERETT WILLIAMS, JJ., joined.

Timothy W. Flohr, Greeneville, Tennessee, for the appellant, Hugh Williams.

Robert E. Cooper, Jr., Attorney General and Reporter; Jennifer L. Bledsoe, Assistant Attorney General; C. Berkeley Bell, Jr., District Attorney General; and Amber DePriest, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

At the evidentiary hearing, counsel explained that the petitioner was contesting only his claim as to conspiracy to commit first degree murder, saying that had he been represented by effective counsel he would not have pled guilty to that offense.

The petitioner testified that he was seventeen years old at the time of his arrest and that, following his arrest, trial counsel met with him at the jail. He said that he had several questions to ask counsel, but counsel told him if he asked more than one, counsel would leave. Counsel told him the same thing on his second visit and did, in fact, leave when the petitioner asked him more than

one question. He said that, even though counsel came to see him other times, he was "confused throughout the whole thing [and] really didn't understand a lot of what was going on." According to the petitioner, he had no criminal record prior to his arrest.

The petitioner testified that, until counsel came to talk to him about the plea bargain offer, he was not aware that he had been charged with conspiracy to commit first degree murder of Steve Myers. This occurred two to three months before the plea was entered. During this period, he asked trial counsel to explain this charge, but counsel never did so in a way that the petitioner could understand. The petitioner said that he was not aware of any defenses to the conspiracy charge. He said that, although he once was involved in a conspiracy to kill Steve Myers, he believed that he had withdrawn from the conspiracy, but trial counsel did not make him "aware" that this was a defense. He said that counsel did not explain what the State would have to prove to obtain a conviction for this offense, but counsel told him if he went to trial, it was "likely" he would be "found guilty and be in prison for life." Because trial counsel said there was a "strong possibility" this would occur, the petitioner pled guilty to the conspiracy offense.

On cross-examination, the petitioner said that, although he signed the documents he was questioned about at the submission hearing, he did not understand them. He said that he understood the second degree murder charge but not that for the conspiracy. He acknowledged that he pled guilty to second degree murder on an indictment charging him with first degree murder and said that trial counsel explained the punishment for these offenses. The petitioner acknowledged that, at the submission hearing, the trial court explained the elements of conspiracy to commit first degree murder and that he said he understood but only did so because he "thought that it would be better to go through with this than to go through and get life without parole." He acknowledged that he told the court he was pleading guilty because he was guilty, that he did so freely and voluntarily with no threats being made, and that he told the court that trial counsel's representation was "excellent."

Trial counsel testified that he was appointed before the detention hearing to represent the petitioner. Counsel did not recall ever cutting short a meeting with the petitioner because he asked more than one question and said he would not be "surprised" if he had met with the petitioner at least twenty times. Counsel said that he and the petitioner "discussed defenses a great deal." After counsel "brokered a possible deal [for the petitioner] and his cooperation," some of the meetings included representatives from the prosecutor's office. Counsel explained the facts of the offenses and why the guilty plea was arrived upon:

> There was an agreement to go to the Hensley residence to kill the three occupants that were there, that was B.J., Lena and Steve Myers, to commit a robbery and then to hide, escape, various ways of covering this up. That was from the first phone conversation I had with him, all the way through testifying today.
>
> Based on listening to him and what he was telling me was happening, and we were set for trial I believe in May, he and I discussed the possibilities of arriving at a plea that was less than either the fifty-one years you could get out of a life sentence

or natural life. And so we actually sat down and talked about what charges would be fair, what would possibly give him some relief. Even a fifty-one year sentence on the first degree murder would probably mean that he would die in jail.

So between he and I talking about various charges that would fit the facts and would be fair for him to plead with, we came up with something we could agree we could present to the District Attorney's office, which with his permission I did.

Counsel explained why, particularly based upon meetings with the prosecutors, he believed that the petitioner understood the plea agreement:

In those meetings with the District Attorney's office he was asked if he understood his agreement and would recite what it was and understand what it was. Also, at the trial of D.J. Hensley, if my memory serves correct, he explained what his offer was and what he was pleading guilty to in return [for] him testifying. So had [sic] every opportunity to see whether he understood it or not in various contexts, and he did.

On cross-examination, counsel said that during the past seventeen years, he had handled "[h]undreds" of felony cases. As to the present case, he filed "[n]umerous" motions and examined all of the State's evidence. He said that the petitioner understood the rights he was giving up with a plea of guilty and was "very aware" of the punishments. Counsel explained his discussions with the petitioner regarding punishment:

You always discuss with any defendant what the ends of the bell curve for possibilities are, and that's always acquittal and always the maximum. So we discussed those possibilities. And what the likely result in this trial was the probability would have been a first degree murder conviction.

## ANALYSIS

The post-conviction petitioner bears the burden of proving his allegations by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f) (2006). When an evidentiary hearing is held in the post-conviction setting, the findings of fact made by the court are conclusive on appeal unless the evidence preponderates against them. See Tidwell v. State, 922 S.W.2d 497, 500 (Tenn. 1996). Where appellate review involves purely factual issues, the appellate court should not reweigh or reevaluate the evidence. See Henley v. State, 960 S.W.2d 572, 578 (Tenn. 1997). However, review of a trial court's application of the law to the facts of the case is *de novo*, with no presumption of correctness. See Ruff v. State, 978 S.W.2d 95, 96 (Tenn. 1998). The issues of deficient performance of counsel and possible prejudice to the defense are mixed questions of law and fact and, thus, subject to *de novo* review by the appellate court. See State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999).

The reviewing court must indulge a strong presumption that the conduct of counsel falls within the range of reasonable professional assistance, see Strickland v. Washington, 466 U.S. 668, 690, 104 S. Ct. 2052, 2066 (1984), and may not second-guess the tactical and strategic choices made by trial counsel unless those choices were uninformed because of inadequate preparation. See Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). The fact that a strategy or tactic failed or hurt the defense does not alone support the claim of ineffective assistance of counsel. See Thompson v. State, 958 S.W.2d 156, 165 (Tenn. Crim. App. 1997). Finally, a person charged with a criminal offense is not entitled to perfect representation. See Denton v. State, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). As explained in Burns, 6 S.W.3d at 462, "[c]onduct that is unreasonable under the facts of one case may be perfectly reasonable under the facts of another."

In order to determine the competence of counsel, Tennessee courts have applied standards developed in federal case law. See State v. Taylor, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that the same standard for determining ineffective assistance of counsel that is applied in federal cases also applies in Tennessee). The United States Supreme Court articulated the standard in Strickland, which is widely accepted as the appropriate standard for all claims of a convicted petitioner that counsel's assistance was defective. The standard is firmly grounded in the belief that counsel plays a role that is "critical to the ability of the adversarial system to produce just results." 466 U.S. at 685, 104 S. Ct. at 2063. The Strickland standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

Id. at 687, 104 S. Ct. at 2064. The Strickland Court further explained the meaning of "deficient performance" in the first prong of the test in the following way:

> In any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances. . . . No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant.

Id. at 688-89, 104 S. Ct. at 2065. The petitioner must establish "that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms." House v. State, 44 S.W.3d 508, 515 (Tenn. 2001) (citing Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996)).

As for the prejudice prong of the test, the Strickland Court stated: "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to

undermine confidence in the outcome." 466 U.S. at 694, 104 S. Ct. at 2068; see also Overton v. State, 874 S.W.2d 6, 11 (Tenn. 1994) (concluding that petitioner failed to establish that "there is a reasonable probability that, but for counsel's errors, the outcome of the proceedings would have been different").

Courts need not approach the Strickland test in a specific order or even "address both components of the inquiry if the defendant makes an insufficient showing on one." 466 U.S. at 697, 104 S. Ct. at 2069; see also Goad, 938 S.W.2d at 370 (stating that "failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim").

Since the petitioner pled guilty to the charge against him, there were additional required showings, which he failed to make, to establish that he was entitled to relief. "In cases involving a guilty plea or plea of *nolo contendere*, the petitioner must show 'prejudice' by demonstrating that, but for counsel's errors, he would not have pleaded guilty but would have insisted upon going to trial." Hicks v. State, 983 S.W.2d 240, 246 (Tenn. Crim. App. 1998) (citing Hill v. Lockhart, 474 U.S. 52, 59, 106 S. Ct. 366, 370 (1985); Bankston v. State, 815 S.W.2d 213, 215 (Tenn. Crim. App. 1991)). Hill explains the showing of prejudice which must be made by a petitioner who entered a guilty plea:

> In many guilty plea cases, the "prejudice" inquiry will closely resemble the inquiry engaged in by courts reviewing ineffective-assistance challenges to convictions obtained through a trial. For example, where the alleged error of counsel is a failure to investigate or discover potentially exculpatory evidence, the determination whether the error "prejudiced" the defendant by causing him to plead guilty rather than go to trial will depend on the likelihood that discovery of the evidence would have led counsel to change his recommendation as to the plea. This assessment, in turn, will depend in large part on a prediction whether the evidence likely would have changed the outcome of a trial.

474 U.S. at 59, 106 S. Ct. at 370.

In the present appeal, the post-conviction court made extensive findings following the hearing:

> In this particular case, this file is about two inches thick and contains within it motion after motion filed, evidence of investigations, pretrial hearings. There were two pretrial conferences in the case in which many matters were discussed in the presence of the petitioner. It really appears that when it came to the point of negotiating a plea, that no stone had been left unturned, that a full investigation had been made, full discovery had been obtained, and there was simply nothing left to do except negotiate or try the case.

-5-

Negotiation was the proper objective because the evidence in the case was overwhelming. This Court tried a codefendant in the case; the jury quickly convicted and sentenced him to life without parole. This defendant's part in that murder was not significantly less than that one's. Although it's argued that petitioner, here, had some lesser involvement, he did participate in the brutal, ruthless killing of this young girl who was an exemplary high school student and just happened to be in that household and would be a witness to the contemplated robbery wherein petitioner conspired with others to kill three people and rob Mr. Steve Myers of money and drugs.

There was no abandonment of that conspiracy because the conspiracy was to culminate in the place this young girl was killed. Mr. Myers was anticipated to be there along with another person, and they were to be killed, and the money and the drugs were to be taken. Mr. Myers was not there, so the conspiracy to kill him for the robbery purposes was over when he was not there, and they killed this girl. He says he stabbed her once or twice but she was stabbed over a hundred times, if I remember correctly, a horrible crime, an innocent girl that had no criminal dealings of any kind that could have or should have caused her to be a victim of such a senseless crime.

Had petitioner gone to trial, he almost certainly would have been convicted of first degree murder, so the only logical strategy was to obtain some degree of punishment less than what he would have gotten had he gone to trial by a jury and been sentenced by the Court; and that was achieved. 25 years at a hundred percent with the next 25 at a 30 percent release eligibility date is [a] considerably lesser sentence than even life with parole which is 51 years before any consideration of parole. It's clear that [trial counsel] did an excellent job in obtaining that result for the petitioner.

This Court observed all throughout the proceedings and at the taking of the guilty plea that petitioner . . . is an intelligent, young man. He's smart, and he did understand the things that his lawyer explained to him, and he did understand the things that this Court explained to him in an allocution transcript that covers 16 pages where the Court carefully explains time and again . . . the definitions of offenses and all the things that are consequences of petitioner entering the guilty plea, and he clearly understands and acknowledges that he does to the Court.

It is most interesting to note that when the Court at the end of the allocution asks the petitioner if he understands everything he says, and he says yes; and if he's satisfied with his lawyer, and he says yes; and if there's anything that his lawyer has done that he has any problem with. It's then that he tells this Court in response to a question, as pointed out by the assistant district attorney general; the Court asks on page 13 of the transcript at the bottom, Are you satisfied with the representation of

you by your lawyer, [trial counsel]? The defendant says, Yes. Then the Court says, Any complaint in any way about how he's represented you[?] The defendant says, No, sir; and then adds, He's been excellent.

It's rare for me as a judge to ever get that kind of response during a guilty plea. I do sometimes but usually the answer to that is just yes or, no, there's nothing that I have any complaint about; but he went further and told the Court that his lawyer had been excellent in representing him. I think that's a true statement, that [trial counsel] in fact was excellent in his representation of the petitioner.

So for all those reasons, this Court finds that the plea of guilty in all respects was voluntarily, intelligently, knowingly, and understand[ingly] made and entered, and that petitioner received representation by his trial counsel that was effective in all respects, that not only was it effective and even though it was effective, that no better result could have possibly happened for the petitioner.

For those reasons, the Court dismisses the petition[] for post-conviction relief and denies that relief.

The record on appeal contains the sixteen-page transcript of the petitioner's submission hearing. It shows that the court explained at great length the charges, possible punishment, and consequences of a plea of guilty. The petitioner responded on numerous occasions that he understood the process. He said, as the post-conviction court noted, that his attorney had given "excellent" representation.

The record abundantly supports the conclusion that the petitioner's plea of guilty to conspiracy was free, voluntary, and knowing and that he failed to prove that trial counsel was ineffective.

We note that the petitioner has raised on appeal a claim not made in his petition or argued to the post-conviction court, that he was so "heavily medicated" at the time of the submission hearing and, thus, could not understand the charges against him. However, this claim is waived because it is presented for the first time on appeal and was not argued to the post-conviction court. As to this claim, we note that the petitioner gave a negative response when asked by the court during the submission hearing whether he had used alcohol or drugs during the previous twenty-four hours.

## CONCLUSION

Based upon the foregoing authorities and reasoning, we affirm the judgment of the post-conviction court.

_____
ALAN E. GLENN, JUDGE

-7-